**CITIZENS UTILITIES COMPANY**

v.

**The UNITED STATES.**

City of Los Angeles, Southern California Edison Company, California Electric Power Company, The Metropolitan Water District of Southern California, Third Parties.

**CALIFORNIA-PACIFIC UTILITIES COMPANY**

v.

**The UNITED STATES.**

City of Los Angeles, Southern California Edison Company, California Electric Power Company, The Metropolitan Water District of Southern California, Third Parties.

Nos. 364-55, 381-55.

United States Court of Claims.

March 6, 1957.

Arthur S. Friedman, New York City, for plaintiff in No. 364–55.

Milton S. Gould, New York City, Ellis Lyons, Washington, D. C., and Gallop, Climenko & Gould, New York City, were on the brief.

Ezekiel G. Stoddard, Washington, D. C., for plaintiff in No. 381–55. Arnold M. Lerman and Cox, Langford, Stoddard & Cutler, Washington, D. C., were on the brief.

Walter Kiechel, Jr., Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Francis J. Robinson, Arlington, Va., and Gerson B. Kramer, Silver Spring, Md., were on the brief.

John H. Mathews, Los Angeles, Cal., for City of Los Angeles. Roger Arnebergh, Gilmore Tillman, Los Angeles, Cal., and Ely, McCarty & Duncan, Washington, D. C., were on the brief.

Edmund L. Jones, Washington, D. C., for the Southern California Edison Co. Arthur J. Phelan, Paul R. Connolly, Washington, D. C., Bruce Renwick, and Harry W. Sturges, Jr., Los Angeles, Cal., were on the brief.

Edmund L. Jones, Washington, D. C., for California Electric Power Co. Henry W. Coil and Donald J. Carman, Riverside, Cal., were on the brief.

James H. Howard, Los Angeles, Cal., for Metropolitan Water Dist. of Southern California. Donald M. Keith and John W. Dickey, Los Angeles, Cal., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiffs sue the United States. for damages because the United States refused to renew their contracts for electrical energy produced at the Hoover Dam on the Colorado River. The two suits have been consolidated since they involve the same issues. The four "third parties" were brought into the case on notices, requested by the United States and issued by the court pursuant to its Rule 19. The facts in the cases appear from undisputed documents, and the cases are suitable for decision on motion for summary judgment.

The Boulder Canyon Project Act, 45 Stat. 1057, enacted in 1928, 43 U.S.C.A. § 617 et seq., authorized the construction and operation of Boulder Canyon Dam and related facilities. But the Act required that, before any appropriations were made or any construction was commenced, the Secretary of the Interior should obtain contracts which would bring the United States enough revenue to repay it, with interest, within 50 years, the money proposed to be advanced by the United States for the construction of the dam, together with all expenses of operation and maintenance. The Secretary on April 26, 1930, entered into a contract with the City of Los Angeles and Southern California Edison Company, Ltd., hereinafter called, respectively, City and Edison, which are two of the third parties in this suit. Under this contract City and Edison were made, severally, lessees of parts of the proposed dam and the power plant machinery, their two parts constituting the whole, and they were obligated to generate, at cost, electrical energy for themselves and for others with whom contracts would be made. City and Edison also agreed to be responsible for paying for 64 percent of the energy produced at the dam, subject, however, to the rights of the States of Arizona and Nevada to take large amounts of this 64 percent allotment when and if they so desired, and subject to the rights of several municipalities in Southern California to take 6 percent of this allotment if they made contracts to do so within a specified time. The allotments of City and Edison, amounting in all to 64 percent, were several, but the detailed percentages of their obligations are not relevant here. But they were obliged, between them, to take and/or pay for all of the 64 percent if no other entity exercised its option to take a part of it.

The Secretary of the Interior reported to Congress that the City-Edison contract was sufficient by itself to provide revenues to pay for the project.

On April 26, 1930, the date of the City-Edison contract, the Secretary also made a contract with the Metropolitan Water District of Southern California, herein called Water District. It is one of the third parties in these suits. Water District was obligated, by its contract, to take and/or pay for 36 percent of the energy generated at the dam. Water District wanted the energy to pump Colorado River water into the aqueduct which it proposed to build from the dam to the City of Los Angeles. City and Edison wanted to be certain that Water District did not use any of the energy which it bought to complete with them in the electrical utility business in their areas. The Secretary therefore inserted in Water District's contract a provision that it could use the energy

only for pumping water into its proposed aqueduct. That restriction created the possibility that Water District might have to pay for a lot of energy that it could not use. Water District's contract provided, in that regard, that the Secretary might dispose of Water District's unused energy by first offering it to City and Edison and, if they did not buy it, selling it to others.

The municipalities in California which had options to take, in all, 6 percent of City's allotment exercised their options within the time specified, and the Secretary executed contracts with them in 1931. In 1936, before the dam was completed, the State of Nevada chose to take a part of the 18 percent on which it had an option, and the Secretary made a contract with it.

Water District's obligation to begin to take and/or pay for its 36 percent was to become effective when two billion kilowatt hours of energy per annum became available. When that time approached in 1937, Water District advised the Secretary that there would be surplus energy available for resale and that that condition would exist until the end of 1954. The Secretary advised City and Edison that the surplus energy was available, but they did not exercise their options to take it. The plaintiffs negotiated with the Secretary and with Water District, which would be the beneficiary of the resale contracts if made. Ten-year contracts were at first considered, but the plaintiff Citizens thought this was too short a period for it to recover the investment which it would have to make in building a transmission line from the dam to Kingman, Arizona, in order to use the power from the dam. It was then decided that the contracts should run to December 31, 1954, and they were so written. The contracts bound the plaintiffs to take and pay for only a small proportion of the energy which they had the right to take and pay for at their option.

The parties proceeded according to the contracts, and the plaintiffs received the part that they were entitled to, and chose to take, of Water District's surplus. On May 31, 1945, the Secretary made a contract with City and Edison, among others, which, the defendant says, conveyed to those contractors all of Water District's unused energy, including that which the plaintiffs were getting under their contracts, but, as to that latter amount, the sale not becoming effective until the end of the plaintiffs' contracts on December 31, 1954.

The plaintiffs, when the termination dates of their contracts approached, applied to the Secretary for renewals of their contracts. These applications were rejected, and the plaintiffs have received no electrical energy under their contracts since shortly after the date of expiration of their contracts. They claim to have been heavily damaged by the Secretary's refusal to renew their contracts, and sue here for those damages. They base their claim upon section 5(b) of the Boulder Canyon Project Act which says:

"The holder of any contract for electrical energy not in default thereunder shall be entitled to a renewal thereof upon such terms and conditions as may be authorized or required under the then existing laws and regulations, unless the property of such holder dependent for its usefulness on a continuation of the contract be purchased or acquired and such holder be compensated for damages to its property, used and useful in the transmission and distribution of such electrical energy and not taken, resulting from the termination of the supply."

The plaintiffs say, correctly, that they were the holders of contracts for electrical energy, and were not in default under their contracts. Therefore, they say, the statute applied to them. The Government says that the plaintiffs read the statute too literally, and thereby miss its meaning. The Government says that the statute intended to grant the renewal privilege only to those who, in effect, underwrote the project, by binding themselves to take and/or pay for electricity

from the project at a time when such promises were a condition precedent to the appropriation of money for and the building of the project. It says that entities like the plaintiffs, who made contracts only for surplus energy available for resale, and whose contracts were for relatively short periods, were not intended to be covered by the renewal provision.

The plaintiffs find flaws in the Government's "underwriters" argument. They point out that although Water District made its contract, on the same day that City and Edison made theirs, to take and/or pay for 36 percent of the energy produced, Water District at that time was a new corporation, not yet financed, and the Secretary, in reporting to Congress that sufficient revenues were assured by contracts, did not include Water District's contract as an asset. They point out that the several municipalities in Southern California which had what were, in effect, options to take a part of the energy contracted for by City, were not underwriters of the project, because before they made their contracts, City had already obligated itself to pay for the energy which they later contracted for. Yet their contracts, when made, contained express renewal provisions. The same seems to have been true of contracts later made by the Secretary with the States of Arizona and Nevada.

If there is any valid distinction between the contracts of the plaintiffs and those of other entities whose contracts did give them renewal rights, it would seem to be that the plaintiffs' contracts covered only surplus energy, disposed of by the Secretary because the one who had contracted to pay for it had no use for it. Is this difference sufficient to deprive these contracts of the renewal privilege written into section 5(b) of the Project Act?

The plaintiffs' contracts contained no provision for renewal. When Water District advised the Secretary that it would have surplus energy for disposal, it said that that would be true until the end of 1954. When the plaintiffs applied to the Secretary in 1937 for some of this surplus, they apparently had no thought of any right of renewal. They say, and apparently correctly, that the information which they had, indicated that the subject matter of their proposed contracts, i. e., surplus energy in Water District's allotment, would not exist after 1954. If the failure of the plaintiffs to insist on, or even think about, a right of renewal were urged, which it is not, as a waiver of their statutory rights under section 5(b), the circumstances might well rebut any inference of an intent to waive.

By the year 1945, Water District had apparently decided that it would have surplus energy for all the rest of the term of its 50-year contract. The situation was acute at that time because a defense plant which had been taking and paying for a large amount of Water District's surplus energy, had closed down. By that time, City and Edison were willing to agree to take Water District's surplus energy, which they had not been willing to do in 1937. So the 1945 contract was made. As we have said, the Government says that that contract intended to include, after 1954, the energy that the plaintiffs had been getting. The plaintiffs say that the 1945 contract did not include the energy which they would continue to be entitled to if their contracts were renewed.

The question of what was intended by the 1945 contract has caused great concern to the Government, of course, since if it did include the energy which the plaintiffs had been getting, and if the plaintiffs had a statutory right to renewal, the Government was in the position of having sold the same thing to different parties. But we think that the intention of the Government and the third parties, when they made the 1945 contract, is not conclusive, and indeed is scarcely relevant, so far as the plaintiffs are concerned. We do not, therefore, undertake to determine the intent of the 1945 contract. We note that the Government's officials had great difficulty in making up their minds as to its intent.

The plaintiffs say that the only authority which the Secretary had for the sale of electrical energy was given him in section 5 of the Project Act; that section 5 says that in making contracts for the sale of energy, section 5(b) *inter alia,* shall govern; that section 5(b) is the renewal privilege section; that in several places in the plaintiffs' contracts there were statements that the contracts were made pursuant to the Project Act. They urge, therefore, that they are entitled to the benefits of the statute. They further say that the equity of the statute providing for the renewal privilege makes it applicable to them. It was intended to protect those who had invested in facilities to use or distribute electricity from the dam, and customers who had become dependent upon the continued flow of that electricity. The plaintiffs say, and it would seem to be true, that these facts existed in their situations.

The Government points to the fact that the plaintiff Citizens represented to the Arizona Corporation Commission that it should be allowed to write off its investment in facilities to transmit energy from the dam during the 15-year period of its contract, and says that this shows that that plaintiff did not count on a renewal privilege. We have already discussed the reasons why the plaintiffs may not have thought that there would be a renewal of their contracts.

The applications of the plaintiffs for renewal were rejected by the Secretary in 1952. They persisted in their applications, and on March 2, 1954, the Secretary offered them, in writing, extensions of their contracts to May 31, 1987. They accepted these offers in writing, but the Secretary ultimately refused to execute formal documents of renewal, and they have received no electrical energy since early in 1955. The plaintiff Citizens bases its claim, in the alternative, upon the renewal of its contract which, it says, was accomplished by the correspondence just referred to. In view of our conclusion upon the whole case, we do not decide this question.

The Government argues that the Secretary, in his dealings with the plaintiffs, was not acting for the United States, but for Water District. It is true that the primary benefit of the sale of Water District's unused energy inured to Water District, because the price received for it was credited to Water District's account. The contract with Water District might have provided that it could market its own unused energy, so long as it did not send it to the area where it would compete with City and Edison. But the Government did not choose to have other persons selling Hoover Dam power at wholesale. Its contract with Water District carefully provided that the Government, through the Secretary, would be the one to do the selling, if it was done. The Secretary was not acting as an agent of Water District. He was acting for the United States, and was carrying out its policy of keeping the sale of power under its control. He was also furthering the interest of the United States in keeping Water District from being overwhelmed by its obligation to pay for power for which it had no use, and thereby, possibly, being disabled from carrying out its contract with the United States.

There is an apparent inconsistency in the position of the plaintiffs, in that they do not claim that their rights, under their renewals, would be as extensive as their rights under their original contracts. It will be remembered that their contracts gave them what were, in effect, options to take specified amounts of electricity, but only bound them to take and pay for much smaller amounts. Water District was willing, in 1937, to permit the Secretary to so contract because it was certain that there would be sufficient surpluses, until the end of 1954, to satisfy those contracts. But the contracts certainly contemplated that if Water District had no surplus after 1954, there would be nothing to sell as surplus to anyone. And they certainly would have contemplated, if it had occurred to the parties, that no extension of the contracts should deprive Water

District of electricity which it needed for its own purposes. The plaintiffs claim only the rights to renewals which would have given them such electricity, if any, as was surplus to Water District's needs after 1954, and was within the amounts set in their original contracts.

Our conclusion is that the plaintiffs were entitled, under the statute, to renewals of their contracts with the limitations which they concede, and that the Government violated their statutory rights when it denied them renewals and refused to give them the electrical energy to which renewals of their contracts would have entitled them.

The plaintiffs are entitled to recover, and judgment will be entered to that effect. The amounts of the judgments will be determined in further proceedings under Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.